Mr. Clement. Mr. Chief Justice, and may it please the Court. In Dudenhofer, this Court articulated a pleading standard that recognized that disclosure of negative inside information by insider fiduciaries could harm the planned and planned participants by immediately reducing the value of the fund. This Court thus required the plaintiffs to identify a specific source of information that could be used to determine the value of the fund. In other words, a specific alternative course of conduct that could not do more harm than good to the fund as a whole. Here, Respondents allege that insider fiduciaries should have taken inside corporate information, disclosed it through the regular corporate disclosure channels, because disclosure was inevitable and the harms from concealment only grow over time. There are two basic problems with that submission. First, Respondents' allegations face an insurmountable PGRM problem. ESOP fiduciaries do not have a fiduciary obligation to use information gained in a corporate capacity or to use the regular corporate channels of disclosure for the benefit of planned participants. It's particularly true with respect to the use of regular corporate disclosure channels. The use of those channels is something that is inherently done wearing a corporate hat, and, indeed, the insiders only have access to the regular corporate disclosure channels because of their corporate roles. It requires no extension of PGRM whatsoever to say that the use of those corporate disclosure channels is a corporate act, and that But second, even if there were a fiduciary obligation to use insider information gained in a corporate capacity or to use corporate disclosure channels, the allegations here would still be insufficient. The allegations that no fraud lasts forever, disclosure is inevitable, and the harms of concealment only grow over time so it is prudent to disclose early could be made in every case. Those generic allegations, by definition, could not separate goats from sheep. They could be made every single time. The premise of Respondents' allegation is also fundamentally inconsistent with the premise of the third consideration in Dudenhofer. The third consideration in Dudenhofer is premised on the objective reality that if you disclose negative inside information to the market, it's going to have a negative impact on the value of the stock, which is all an ESOP holds. And so this Court said, we need something very specific, very different from the normal course that would allow the fiduciary to say no disclosing this and committing this immediate harm is nonetheless prudent. So in your second argument, is it your point that there are always going to be different classes of beneficiaries, some of whom would be harmed, some of whom would be helped by earlier disclosure, and therefore the duty of prudence cannot be violated in those circumstances? I think that's absolutely part of it. I mean, I think there are multiple problems. What more? Because that seems to come out of your second argument. As close to a bright line, you have the exception for the newly, the new plan, but it seems close to a bright line. I'm wondering if there is any wiggle room there or is that pretty much a bright line? I think it ends up being pretty close to a bright line, which is, I mean, the reason you can have an exception for the situation where it's a newly created ESOP is because in that situation, you don't have to trade off the interests of net buyers and net sellers, short-term holders, long-term holders. Can you imagine a circumstance where you have different classes of beneficiaries where there would still be a claim that could be made that earlier disclosure should have been made in a stock price drop case? I have trouble coming up with one of those. Now, I don't think that means you can't have duty of prudence claims in this context. I mean, the classic duty of prudence claim, which has the virtue of not trading off different beneficiaries' interests, would be a duty of prudence claim that says that when the company set up this ESOP, they didn't set it up in the right way, or when they're buying or selling, they're paying above-market commissions. Those kind of duty of prudence claims could be, you know, pled, and they don't create this kind of tradeoff of the interests of one group versus another. So I definitely think that's an important feature of this. But I also think it's worth recognizing that the premise of the Respondent's claim is really directly contrary to the premise of the Third Dudenhofer consideration, because the premise of their claim is that no fraud lasts forever. Not this fraud in particular, but no fraud lasts forever. The costs of concealment always increase over time. They cite a 1990 law review and a 2008 financial journal in their Second Amendment complaint to buttress that claim. And so early disclosure is always going to be the prudent course. Sotomayor Not necessarily. There's time for investigation, proper investigation. There's time for corrective measures that could reduce the loss. The economic principle, however, is both logical and supported by the literature. So I'm not sure what you think is missing from the specifics other than your answer that the economic principle shouldn't exist at all. That seems to be – but isn't that a matter of fact for the trier effect? It'll be a battle of competing experts, but certainly shouldn't they be entitled on a motion to dismiss to rely on what is well-founded economic theory? Well, I hope not, which is to say – Well, why not? Because I think in a situation like this, a fiduciary that's facing these competing obligations among different members of the plan and is also confronted with a – You can't really be saying that it's a fiduciary duty to help sellers promote fraudulent conduct by avoiding losses for people. That seems contrary to what we would want in – of a fiduciary or of a securities law, that sellers – that you're going to take sellers into account because they're going to avoid the fraud, the effects of a fraud. They're going to benefit from it. They're not very logical, is it? It seems to me you have to look at what holders are experiencing and what potential buyers are experiencing, and by that measure, both of them will be harmed by delay. So, Justice Sotomayor, I think there's two points there. There's what you expect the fiduciary to be doing and then what you expect the corporation and the corporate officers to be doing. With respect to the fiduciaries, when it comes to an ESOP, what you really expect them to be doing is not much, because if they do anything with inside information to try to benefit the plan participants and not the market as a whole, they run – No, they're wearing their corporate hat. As an ESOP, they're charged with exercising due diligence and care for – as a fiduciary. Wherever they secure the knowledge from, there's no case that says where you secure the knowledge from defines your duty. How you act may define your duty, in your corporate hat or in your ESOP hat, but not where your knowledge comes from. Well, Justice Sotomayor, it would require an extension of PGRM to say that there's no obligation to use the inside information gained in a corporate capacity in a fiduciary capacity. I admit that. I think that would be a wise extension of PGRM, and I think it would reflect the reality that in practice, on a day-to-day basis, no ESOP that is being managed by insiders is using inside information in an active way to trade. All of these programs are essentially set up to prevent that from happening in order to comply with the securities law. But it doesn't – But that's different from disclosure. You're right. And it's much different from what you're obligated to do. Sotomayor, the securities laws are not the self-definite – contrary to the government's position, the securities laws don't purport to govern your fiduciary duties. Exactly. And so when you have a case like this where Respondents have alleged that the specific course of conduct that's going to not do more harm than good is to disclose through the regular securities channels, that is a clear sign to you that that is a PGRM problem, because the regular securities channels of IBM, the disclosures that are made through those channels are made by IBM officials wearing their corporate hats to disclose on behalf of the corporation. And if you look at the complaint here, there's nothing about this complaint that's specific to these fiduciaries did something as a fiduciary that you expect a fiduciary normally to do that was wrong. This is a securities law complaint. And it's perfectly fine to have it brought as a securities law complaint when the basic beef is that insiders at the corporation used corporate disclosure channels to not give enough information to the market as a whole. But that's what this case is, is a securities case. And I would respectfully submit it should be pled under the securities law, it should be subject to the limits of the PSLRA, it should be subject to the limit that this law, we don't have aiding and abetting claims under the securities law, but you can have all of that as an ERISA cum securities action where you don't even have a SIENTA requirement. And I think if you think about the way that this case was treated as a security case, it's very, you know, the underlying securities allegations is that IBM miscalculated and misapplied the gap regulations and didn't make an early disclosure of the losses of the microelectronics unit. Now, in order to figure out whether that's a securities violation, you have to figure out whether the microelectronics unit is sufficiently separate from the broader reporting unit that it's part of. Now, the district court, when it heard this case as a securities case, said, I'll give you just over the line on that allegation. It seems kind of complicated, but I'll get you just over the line. But then under the securities law, I get to SIENTA, and I have to see a strong inference of SIENTA here. This is like a debatable principle of accounting. So I'm going to dismiss this claim. Roberts. Mr. Clement, if we could just back up for a minute. I have, I guess, an antecedent question. I understand that a great deal of your brief is devoted to arguing that liability under ERISA should be coextensive with the Securities Act for insiders. And I suppose some of that may follow from the idea that Congress has approved insiders as fiduciaries for ESOPs. But I guess I'm less clear why this Court should be in the business of accommodating that decision. It's a choice. It's not an inevitability that insiders would serve as trustees. And I guess I'm not clear exactly what employees gain from having insiders as trustees if, at the end of the day, they wind up being know-nothings because they can't do anything. As you've kind of indicated, they just can't do anything. An outsider might, in these circumstances, be able to make a reasoned judgment of some kind about whether to sell or buy or act differently in a way that an insider is, as you point out, disabled from doing. So can you help me with that? Clement. I'll try to, Justice Gorsuch. So first, I don't think it's right to say that the outsider is going to be in a better position to do something with this information because the outsider, by definition, isn't going to get the inside information that you're only getting because you're a corporate insider. These things leak. It's possible. Maybe not. But at least there's a metaphysical possibility they can do something other than be a know-nothing. And so, again, can you help me understand why we would want to encourage insider trustees and provide special rules for them? What's gained by employees? I didn't see any real account in the briefs, I'll be honest, as to what Congress was getting at here, why it's a good idea, why we should underwrite it. Clement. So, you know, I don't want to quibble too much on the premise. I mean, if it leaks, it's public information, so you're in a different box. But I want to be responsive. And here's what I would say. What employees gain is two things. One is they do gain some cost savings because it costs less. Okay. You're shaking your head. So let me go to my point. I'm not shaking my head. I'm just like, you know, maybe. Okay. But the cost savings do directly benefit the plan participants. Yeah. I mean, if you go out and get Vanguard, you know, the company is not going to pay for that, the plan participants are. Yeah. But here's the real thing you gain, which is you incentivize companies to have the pension plans in the first place, and you incentivize them to have pension plans. You've got to take a step back. And this is what the court did in Pegram, which is, you know, this is an unusual regime, right, because there's a lot of responsibilities that come with having an So in part to incentivize companies to have them, they said we're going to deviate from the common law rule where you couldn't have an insider serve as a fiduciary, and we're going to deliberately deviate from the common law rule, and we're going to set this up. It'll be easier to do it. Now, what companies like IBM have done, and I think it's important to understand this, is they have not said, oh, well, you know, for everything else, we offer 201 funds in our plan, and for everything else, we're going to use Vanguard, but for this ESOP, we're going to use just our inside guys. That's not how they do it. They set up all 200 plans. They have very senior corporate officials run that. They think they're doing their employees a favor, not only by saving the cost, but by having very sophisticated individuals run these various funds. Now, if you tell them that they are going to uniquely face these kind of securities actions without the protections of the PLSRA if they have the fiduciaries, the insiders run the ESOP, because the real risk here is with the ESOP, the easiest thing for IBM to do is to say, let's get rid of the ESOP. We're not going to, we're not, and that's clearly contrary to Congress's intent, but they're not going to change the way they run 200 funds in order to accommodate the ESOP. They'll just get rid of the ESOP. So that I have the roadmap clear, if we were to agree with you on your second argument, which the one we discussed earlier, we don't get into the Pegram issue or some of the issues raised by Justice Gorsuch and some of Justice Sotomayor's questions, right? I think that's right, and then I may be back here in another three years, and I think the advantage of the Pegram issue, I mean, and part of the reason we thought we should present it for the Court's benefit, is that that really, I think, would be a more complete solution to this, because I think we've had. Sotomayor's That's not what you asked for, sir, Don. You have a, I read the question, whether the more harm than good pleading consideration from Fifth Third Bancroft can be satisfied by generalized allegations that the harm of an inevitable discovery of an alleged fraud generally increases over time. Now, I, I, what do you imagine, or do you imagine, that there's any particular disclosure that could meet that standard? Later, what's missing from what they say? What's missing is any kind of detail about the nature of this plan, the precise that 98 percent of the people were, were net buyers. I mean, maybe you could imagine that, but, but honestly, this is where I was getting with this, is I think, you know, the courts have had five years of experience, or whatever it is, with the Dudenhofer considerations, and I think as the cases have matured, what you've seen is that the claims of the prudent alternative course have migrated. They started with things that actually were fiduciary actions. They were actions like, let's just stop trading. I mean, that would be a fiduciary action, or let's make an extraordinary disclosure, not within the normal security channels, make an extraordinary disclosure. But when courts were confronted with those courses, what they concluded is, ah, prudent fiduciary could say that's crazy. And so those claims didn't get off the ground. So as these claims have matured, the plaintiffs have said, ah, we know the, the right way to do this is a very subtle disclosure through the regular corporate channels, and that'll solve the problem because it won't spook the market. But the problem is really twofold. Once you do that, first of all, you've said that they really have to put on their corporate hat, and they have to make the disclosure through the regular corporate channels. And part of the reason it's less spooky for the market is because we're used to corporate officials making disclosures through regular corporate channels. We're not used to fiduciaries coming in and blowing the top off of the whole thing in some extraordinary way. And so they really do plead themselves into a pegum problem. But the second thing, and I think this is very important, is as the cases mature, my friend on the other side points out quite correctly that you can't make any disclosure just to the planned participants. So you have these special responsibilities as a fiduciary to the planned participants, but you can't make a special disclosure to them. You have to disclose to the entire market. But once these cases have matured to the point where the, even the plaintiffs are saying what you need to do is you need to make a disclosure to the entire market, and you need to do it through the regular corporate disclosure channels, boy, we have a body of law. That is precisely attuned to regulating the adequacy of disclosures by corporate officials through corporate channels to the market as a whole. Breyer. Your argument now and the government and most of the briefs here seem, as Justice Sotomayor pointed out, to be addressing a different issue than what we granted cert on. And they seem to be dealing with what I call the second part of the three considerations. And that is how the relation between securities laws and ERISA law ought to be. When at the last sentence there, it was absolutely deliberate. Namely, we didn't have the views of the government. All right. So now we have the views of the government on that question. But in reading them, I realize, one, I don't know what the lower courts think about those views. I don't know what the securities community and all the others think about those views. Therefore, why don't we just stick to the question on which we granted cert? Namely, the third question. And as to that, in their amended complaint, from 106 to I think 111, they have allegations in those paragraphs that, when I read them, seem fairly specific. Rather, well, we know what they are and you know what they are. So, one, why don't we simply address that, leaving the other questions you raised to be developed in lower courts, and then having addressed that, we look at what they say here in the complaint. And at the moment, I'm thinking it seems adequate. What's wrong with it? So, Justice Breyer, I think that it is – I mean, we're happy to win this case under the third factor or the second factor. Obviously, if you tell me you're going to vote against us on the third factor, I'd really like you to look at the second factor. But in all events, I don't think we should lose under the third factor, because if you look at the allegations here, most of them could be made in every single one of these cases. Not this one. During the class period, the plan was a net buyer of stock. They've walked away from that, because it turns out, although they alleged it, it was wrong. And the district court – Breyer, that's for the answer. No, no. The answer says the complaint alleges such and such. It's wrong. And now we'll have some discussion about that. With all due respect, what happened here is they made that allegation based on publicly available documents. It was pointed out to the district court, and the district court, in dismissing this case, said that's wrong, it's a net seller, I'm not going to decide this case on a mistaken fact. And so he said it's publicly available to me. It is – I'm going to take judicial notice of it. They were a net seller by a couple hundred million dollars, which, of course, is exactly what you'd expect with a mature plan from somebody like IBM, as opposed to a new startup where you might think they'd be a net buyer if you think about it long enough. So in any event – If they'd alleged that the trustee didn't know that they would be a net seller, would that then be sufficient? I don't think so, because I think particularly the fiduciary of a long-established plan could say, I don't know it for a fact, but I think we're very likely to be a net seller. If I could avert you to another one of their specific allegations. Do you want to just give a reference? Yeah. It's on page 29. This is their so-called inevitability allegations, which are case-specific. But, of course, they say that the sale is more likely than not, and that if there were a sale, it would be likely that they – that the results would be disclosed. So more likely than not and likely does not equal inevitability. So if you want to look at the very specific allegations here, I don't think it gets it done. Thank you, Your Honor. Thank you, counsel. Mr. Ellis. Mr. Chief Justice, and may it please the Court. In Dudenhofer, this Court recognized that an ESOP fiduciary would sometimes have an ERISA-based obligation to take action based on inside information. The Court, however, didn't define the precise circumstances but identified certain relevant considerations for future cases. Here we consider just one possible response to inside information, namely to disclose it to the entire market. But there's a well-developed body of Federal law about when such disclosures are necessary and appropriate for the protection of investors. In the views of the SEC and the Department of Labor, while a prudent fiduciary may be required to take a number of actions based on inside information, ERISA should rarely, if ever, require a fiduciary to effect an unplanned market-wide disclosure that the Federal security laws do not require of that fiduciary. Why? I'm sorry. I think for two reasons, Your Honor. That's okay. That leads quite next to what I was going to say. We think it would undermine the objectives of the securities laws to impose an additional disclosure regime based on the ad hoc balancing of a single ERISA fiduciary. And, importantly, to your point, Justice Breyer, we think that a prudent fiduciary could conclude that making such an unnecessary disclosure would do more harm than good to the ESOP participants. Ginsburg. May I ask you a question about this theory of yours? I saw it nowhere aired below. And then you come in with a brief, and you seem not to focus on the more harm than good standard, but you say that an insider has a duty to disclose nonpublic information under the Securities Act. So we're going to use the Securities Act. But I didn't see that in the district court or the court of appeals. So we are – when the court came, or the case came to our office, we looked at this case afresh, and we decided what can we add, what can we – how can we be useful to the court. We think we can be useful to the court by discussing the objectives of the securities laws. But I – importantly, as I just noted, I think our – all of our analysis is just as relevant to the third prong, to the more harm than good standard as well, because I think a prudent fiduciary in this position that faces the confines of the securities laws, where they can't do what it is that everybody would agree is the best thing for the participants, right? They should trade on the inside information, or they should disclose it selectively to those participants. They can't do that. The securities laws make that illegal. And so the question is, should I make a public disclosure? And when you get – when you're talking about doing that, I think it's prudent, and I think at least a reasonable fiduciary could conclude it's prudent, to not – to look to the balance that Congress has struck and that the commission has struck into deciding when such disclosures are necessary and appropriate for the protection of all investors, including the very investors that are participating in this ESOP. As I have always understood the securities law, it only controls disclosure to the extent that something you say is misleading, is fraudulent. You have to have a statement that is misleading or fraudulent. Let's assume it's a new company, and you don't have to make a statement, but you inevitably caught, and it's going to be caught before you have to make a disclosure. You're suggesting that in that situation, there is no duty to the – to, as a fiduciary, to make a disclosure that is not required by the SEC? So, a couple points, Your Honor. On the first – on the premise of the question, it's just not accurate that the – a lot of the securities laws and anti-fraud provisions are based on misstatements and corrections of misstatements, but there's an entirely additional disclosure regime where certain events that are major events, like material impairments or like changes in control or definite agreements, have to be disclosed within four days, regardless of what you've said before. And then there's 10-Q and there's 10-K. I would also point out that this very case is, in fact, based on allegations that the company had made a misstatement before and needed to correct that misstatement. So this is a fraud case, a 10-B case. It's just that no one has evaluated whether the allegations are sufficient to state that. Do you think that it is workable, practical, to require an insider fiduciary to determine whether the disclosure of inside information to the public is sufficient at a particular point in time will do more harm than good? Is that inherently a workable standard, or is it your argument that it is not and that's why you reach the position that you reach? It seems to me in that situation the fiduciary has to make a very complicated calculation. But maybe it's more doable than it seems to me. Whether the – are the participants net – are they net buyers or sellers? What will the situation be at some point in the future when the information will inevitably come out? So I think it is workable in the sense that if you – a prudent fiduciary in that position would not be ignorant, would not as close its eyes to the entire body of law that's intended to balance those interests. I agree that it's not a workable solution to have an ad hoc balancing, and I don't think it would be – as I said, I think it would be inconsistent with the securities laws to impose this sort of ad hoc disclosure regime on every company, public company, that's got an ESOP with insider fiduciaries, but not on the rest of the market. But I think what a prudent fiduciary would do, it's our position, is that they would look to that body of law and they would reasonably conclude, or at least they could reasonably conclude, which I take to be everyone agrees is the standard here, that making a disclosure that the company has decided is not in the best interest of the shareholders and the Federal securities laws, the expert and the expert commission has decided is not necessary and appropriate for them. That does sound. Breyer. Well, where we are, it seemed to me, is you're trying to argue both, but are there things in the securities laws that mean that the fiduciary should not disclose information that will drive the price of the share down? That's what you're saying. Okay. That's not what we granted cert on. And the reason that I stress that is because my reaction to what you say is, I don't know.  So I assume that in this case, he should have, he should have, a prudent trustee would have disclosed the information to the market through the channels that they are suggesting. Next question. Is there a special reason why he shouldn't disclose it anyway? Because disclosing it will hurt the plan and its participants. Answer. They say, no, there's nothing special here. As a general matter, disclose it sooner rather than later if, as the court of appeals said, disclosure is inevitable. So they allege it was inevitable. They allege that loads of information that shows if it's inevitable, do it fast, that will not hurt the plan. It will help it. And there we are. Criterion 3 is satisfied. So I've sketched out, they'll put their position better than I did, but still, if that's roughly their position, why don't, if we narrow the question to what we granted on, why don't they win? I think because a prudent fiduciary can't narrow. It's artificial to say that a prudent fiduciary would, should, would or could or should ignore the body of law that speaks to this precise question, that speaks to precisely when a company should make not a selective disclosure to just the participants they can benefit on, but a public one, a market-wide one for all investors. That's what the Securities Commission has set out to do in its disclosure regime. And we think it would be unhelpful and artificial to assume in this case that a prudent fiduciary would just ignore that body of law. And I'd point out that it's not always true that you would disclose, disclosing information if that will come out. Sooner would be better. It may be in the case of negative information, but positive information would come, would go through the same analysis. Kagan. Please. I mean, it does sound like you want us to scrap Dudenhoffler and start all over  again. So I don't think that's, I don't think that's right. I think our position is fully consistent with Dudenhoffler. And, and all three factors are still relevant. It's just that in this precise circumstance, the first two factors do all the, do a lot of the work. So take, for example, a case where the, where the complaint was you should take, the alternative action you should take was to trade on this information or, or was to selectively disclose it to the participants. I think we'd say no. Indeed, Dudenhoffler says no, because that's illegal, and prudent fiduciaries don't take illegal acts. That doesn't mean that you're somehow writing out the second and third considerations in Dudenhoffler's. But those factors were in service of a particular test that said, you know, we want to ask whether a reasonable fiduciary would look at this and say that there's a course of action that would or wouldn't do more harm than good. I mean, that is what I think Justice Alito called a balancing test. And that's what Dudenhoffler said we should do. Now, there are reasons against balancing tests, but that's what it says. Sure. But before you get to that factor, the Court said you should also consider whether a RISA-based obligation to disclose in that scenario would be inconsistent with the objectives of the, of the securities laws. We think in almost every case it would be, and so you don't have to get to that third factor. But even if you do, we think a reasonable prudent fiduciary could conclude that making a disclosure that's not required by the securities laws, the commission that balances what, how much disclosure is too much and the timing for those disclosures would do more harm than good to the, to the investors in the ESOP. Thank you, counsel. Mr. Bonderoff. Mr. Chief Justice, and may it please the Court, Dudenhoffler said that ESOP fiduciaries owe the same duty of prudence as every other RISA fiduciary, except they don't need to diversify the fund's assets. And this is meaningful as a pleading matter and also as a substantive matter. We forget sometimes Dudenhoffler was about a circuit split where a presumption of prudence in favor of ESOP fiduciaries was either to be applied at the pleading stage or at the evidentiary stage. And this Court found that notwithstanding all the policy concerns about the need to encourage ESOPs and all the difficulties caused by the intersection of the, of the two, it was still not appropriate to have that presumption in place. It's not in the statute. The statute says the duty of prudence here is basically the same as would apply to a non-ERISA investment. And in fact, a lot of the issues we're discussing today about administrability and how difficult it might be to apply this test come up in the non-ESOP context all the time. When you have an investment that is alleged to be imprudent, a mutual fund that's alleged to be imprudent, you will have people in the plan who are different stakeholders, differently situated. Some of them are long-term investors. Some of them are short-term investors. And whether the plan in that case isn't deciding not, whether or not to disclose, but they're deciding whether or not to sell the investment or take it off the menu, they have to balance those interests of those different shareholders all the time. And they have to make a lot of very difficult decisions. And they do, in fact, if they're doing their job right, a lot of very difficult analysis in monitoring those investments. And the way courts have been dealing with those kinds of cases for decades is on a case-by-case, context-specific basis, essentially asking the same kind of question that the Court asked here in Dutenhofer. Is the decision that you're examining, would it have done more harm than good to the host to be protected? Breyer. On that particular point, if you take paragraph 106 out of your amended complaint, then it seems to me what they're saying is all you've left is you just have an allegation that, well, it always causes more harm. It never causes more harm than good to sell, to reveal quickly. And they say that couldn't be enough. All you did was take the sentence from Dutenhofer and just write it in slightly different words. And they're saying that that wasn't good enough to satisfy it. You should have been more specific. You should have listed a few of those shareholder interests. You should have. Which you tried to do in 106, but they said that was wrong. Okay? So what about that? Well, actually, 106 is not the only place where we talk about those interests. This case here is actually not, does not turn on that general allegation, that economic principle about disclose sooner rather than later, because it is not always going to be the case. If you are looking at it from the perspective of an ERISA fiduciary, better to disclose sooner than later. But here it was, because here you have a year of trying to sell the company and hiring Goldman Sachs to do it, a year of that, before we even say the class period begins. We didn't say they should be sued as of 2013 when they start looking. We say a year later, when they've been trying to do this for the year, when they've invested considerable resources in it, it's more likely than not inevitably going to be disclosed. But isn't the problem, as the Fifth and Sixth Circuits said in similar circumstances, that you have different classes of beneficiaries, some of whom would be harmed, some of whom would be benefited, and when that's the circumstance, it's a little hard to hold the fiduciary liable for violating the duty of prudence, given the different interests of the different classes of beneficiaries. What's wrong with that, that conclusion? There are a couple of things that I would take issue with. I'm not necessarily with the Fifth and Sixth Circuits' rulings, but they came to those conclusions based on different underlying facts. You can't know in real time if you're going to have more buyers than sellers. You can't know this kind of information until after the fact. And ERISA has always looked at, even going back to before ERISA, we've always looked at what they knew at the time. But what you can know, and what you can think about and put at the fore, is the long-term interest of the investment, because the long-term interest of the investment can't be determined. Roberts. But how is it that an ERISA fiduciary wouldn't know at the time whether the fund is a net buyer or seller? I would have thought that information would have been available. You're positing that it's not available, and I guess I'm just a little confused. I'm sorry for interrupting, but that's just not obvious to me. Well, it depends on the way the plan is operated. And, frankly, and I'm speaking from experience here, having litigated on both sides of many ERISA cases, you generally are not going to know that information about what the fiduciary is new until you get to discovery. Oh, I understand that the plaintiff might not know at the time he's pleading his case, but the ERISA fiduciary would know, I would think, whether the fund is a net buyer or a net seller. Wouldn't the fiduciary know that? Perhaps. Again, it depends on the plan. Some do, some don't. If the fiduciary does not know, doesn't that hurt your case? Not necessarily, because — Because there's even more uncertainty about how the different classes of beneficiaries would be affected if you really don't know the precise circumstance. Am I missing something there? Well, even if you know that it's been a net buyer for the past year, you don't know, and I think even the Fifth Circuit pointed this out in Martone, where it was alleged to be a net buyer, you don't know that that's going to continue for the foreseeable future. And you're not required as a fiduciary to predict the future about that. But what you can't do. But what do you think a reasonable fiduciary is supposed to do if the fiduciary doesn't know? Well, the one thing you do know for sure is that if you make a disclosure, the stock price will drop. We concede that. And that harm, both the drop and the timeline of the recovery, that's going to affect the holders. And for the vast majority of ERISA plans, including this one, most people are neither buyers nor sellers. Most people are holders. Most people, especially when it comes to their ESOP, don't buy and sell on a regular basis. They sit and they don't pay attention to it at all. And if you're going to have a harsher stock price correction and a slower stock price recovery, that will affect all the holders. That will affect the long-term stability of the investment. Kagan. So is your view that in pretty much every case, maybe there are some exceptions, but that in pretty much every case the role of the fiduciary is to operate consistently with the holders, neither the buyers nor the sellers, but just the holders? Well, when you're thinking about the long-term, what's best long-term for the investment, you're going to think about the holders more than the buyers and sellers. There could be specific factual circumstances where you have an unusual company in an unusual situation where, in fact, most of people are buyers or most of them are sellers. But in the vast majority of cases, yes, you should put the holders up front. You said a number of times the long-term value of the investment. Why is that the thing that the fiduciary should look to? Well, for one thing, it's the thing you can actually make a reasonable assessment about in real time at the time based on what you as a fiduciary know. It doesn't require you to figure out whether you've been a buyer or seller over the past however many years or months and then try to make a prediction about whether you will continue to be a buyer or seller. It's something you can think about in a way very much the way you would think about other non-ESOP investments, because that same issue comes up with a non-ESOP investment all the time. Well, if that is the case, and we're supposed to — the fiduciary is supposed to consider the long-term best interests of some abstract, non-identified person, why wouldn't the securities law be a really good place to start and maybe finish in assessing what those long-term overall health of the corporate interests might be? I would respond to that in two ways. One, I think as a practical matter. I mean, isn't that what the securities law are all about? It's ensuring the markets function on a net basis with as much transparency and efficiency as we can muster subject to reasonable — imposing reasonable costs and reasonable duties on people. I don't disagree with that description of the securities laws, but the securities laws have different interests than ERISA does, and that's going to create a problem when you're talking about both — Well, but I accept that if we're talking about some specified ESOP member, but you've told us to ignore that. You told us to ignore whether we're talking about a buyer or a seller, just abstract it to the general interests of the plan as a whole. And once we do that, I would have thought the securities law would have been a really good proxy for the duties we'd expect a fiduciary to abide. I think as a practical matter, much of the time it is, but not all of the time. And what we are here to discuss and what the question presented to this Court is about is what kind of a pleading standard should be adopted. Well, where do the two diverge? Well, I could envision at least two situations where they might diverge. And the reason they do is because the two statutes have different concerns and they protect different interests. So the securities laws care about motive. So that's why you have to plead scienter. That's why there's a strong scienter requirement, because bad intent matters. ERISA doesn't care about motive, and it never has. Now when it comes to the — Kagan's laws and ERISA are meant to prevent, you're just pointing, you know, he would say you're using the ERISA clause to water down the securities standard. No. It will actually play out as a real difference. Because let's say you adopt the government's rule. We'll be back here in five years trying to figure out what that means. It seems like a nice, bright line, clear rule. It's not. And if you think about it a little bit and push forward, you can see why. Because when you're pleading a claim under the securities laws, you have to meet the pleading standard of the PSLRA. We all agree on that. And when you're pleading a claim under ERISA, you don't. We all agree on that. You don't plead scienter for a duty of prudence claim. Now, let's say we've adopted the government's rule. Now do I have to plead as an ERISA participant scienter under the PSLRA in order to plead more harm than good under ERISA? And if I don't, what do I have to plead? Because is there a securities law violation if there's not an actionable 10b-5 action underneath it? Or is the standard maybe what the SEC could do if it brought an enforcement action, because the SEC is not obliged to meet the PSLRA standards? How is that going to work? We're going to be sending that back to the courts, and they're going to be trying to figure out how do I apply the securities law, which cares about things like ERISA action, which doesn't, and figure out if that's more harm than good. Is a securities law disclosure required but under the standard of ERISA? It actually gets very confusing when you try to apply it. Kagan. What was the second way? Didn't you say that there were two ways it would diverge? One is the scienter standard. Maybe I'm wrong. No. I think I got to both of my points, ultimately. Well, if that's the point, I guess the response that I expect we're going to hear in rebuttal shortly enough, might as well just get your thoughts on it now, is, well, maybe we ought to just apply the same rule we apply to all private litigants. And maybe that's the answer. And you say, well, ERISA doesn't care about that. And maybe Mr. Clement says, well, it does in this context, because if we're completely aligned with the net interest of the company, as you've suggested, then that is the standard that best protects them, that we've developed over time and through the securities laws to protect investors consistent with, you know, reasonable — imposing reasonable duties on people. I expect something like that. And I just wanted to give you a chance to have the opportunity to respond before Mr. Clement launches. Absolutely. And actually, now, I think in answering your question, Justice Gorsuch, I can get back to that lost second part of my answer to Justice Kagan, which is that if you force people to plead what a private litigant could plead under the securities laws but under ERISA, you are, as a matter of plain language of the ERISA statute, imposing a pleading requirement on an ERISA claim that is not in the statute. You're doing exactly what this Court said it couldn't do in Dudenhofer, because there is no scienter requirement under ERISA. The law of trust has never required it for a prudence claim. And I could actually envision a situation where the securities laws might require disclosure, but ERISA wouldn't. And the government's rule really doesn't adequately address that either. I think of it as the Reinhardt example, the Second Circuit case of Reinhardt. So you have Lehman Brothers, which has massive subprime exposure, and you bring a securities claim against them and say they should have disclosed it once they knew the risks and so forth. It's a pretty straightforward 10b-5 claim. And the securities laws say if they knew about it and they had the requisite scienter, they should have disclosed. But if you're looking at it from the point of view of ERISA and what a prudent fiduciary would think would do more harm than good at the time, you could make an argument, a plausible argument, that a prudent fiduciary would say, well, it's a particularly fraught time in the market for companies like us. Bear Stearns has gone under. People are wondering if we're next. I actually think from an ERISA point of view, we ought to wait. And that's part of the reason we do a separate inquiry for an ERISA claim as opposed to a securities claim. I mean, the fiduciary, the fiduciary who is simply managing a fund is not necessarily doing things on a very regular basis that affect the market price of stocks. But an insider fiduciary here would be, wouldn't it? And an insider fiduciary would receive daily or very regularly all sorts of information that has, that might, if disclosed, have an effect on the price of the stock. So wouldn't it, is this going to result in the constant injection into the mix of information about stocks, all kinds of information that wouldn't otherwise come out? I don't think it will. It would apply to positive as well as negative information, right, doesn't it? I wouldn't think it would. I would say the Munch presumption first came out, and I am, I promise, getting to the question. The Munch presumption comes out in 1995. And then over the course of the next 19 years, it's adopted by various circuits, although not all of them. All that time, there are people bringing claims against insider fiduciaries for failing to make the kind of disclosures we are talking about. Yet, as far as I can see, there was no difference in the number of insiders who continued to be appointed as fiduciaries, and there was no diminution in the number of ESOPs that companies decided to have. In fact, if you take that rule, that an insider fiduciary, the rule, the Pegram rule, although I think it's really a misreading of Pegram, but the Pegram rule that Mr. Clement is talking about, imagine a situation like the Enron case. The reason there was a viable prudence ERISA claim against the Enron fiduciaries is that they were also insiders who knew that the company was a house of cards. And so they should have acted on that information to protect plan participants. Under Petitioner's rule, the Enron fiduciaries have no ERISA obligation to act on their information about a company like Enron. It doesn't make sense, and there's no basis for it. A question I think it was Justice Breyer raised earlier as to why it's useful to have fiduciaries who know the inside information and are therefore in a better position to act to protect plan participants. That makes them, that's an advantage. That's a feature and not a bug. The case where you have here, where you have, and I can, I sense that we all have a little bit of a concern about a situation where securities case is dismissed for failing to plead scienter, as happened here, but the ERISA case is allowed to go forward. And it seems like, are we opening the door to repleting securities cases as ERISA cases? Is this going to happen all the time? It shouldn't. This should be the rare exception that even the government in its brief talks about, you know, extraordinary circumstances when you might need to make a disclosure even though the securities laws don't require it. I don't think they have this case in mind, but this is actually a rare case where you have a situation where you have fiduciaries who happen to be insiders, insiders who happen to be involved in the thing that we have alleged to have inflated the stock price, who happen to have direct knowledge in that and who happen to have responsibility for the accounting of that and therefore are in a position to know about it. You know, there is a fourth member of the Retirement Plans Committee we didn't sue, the Senior Vice President of Human Resources. We didn't sue him because they wouldn't have any knowledge of microelectronics, the effort to sell it, or how to account for that. But we have the general counsel, the chief accounting officer, and the CFO. And they spend a year trying to sell this. It becomes more likely than not that it's going to be sold. And if it's sold, the disclosure is going to come out. And you're not in a situation where IBM is at a particularly sensitive juncture such that they can't make the disclosure without throwing things into disarray. I guess I'm not sure why it's so rare. I mean, the things you just identified. Fiduciary, who's an insider, that's what this is about, and then knows something. Whether they're involved or not, as long as they know, the duty is triggered. So that's something that's going to affect the stock price. That doesn't seem rare at all. That seems fairly commonplace. Am I wrong about that? I think so. And I speak not just in theory, but from my own experience with these cases, both before and after Munch, or before and after Dudenhofer, I should say. These cases, even with the standard as applied by the Second Circuit here, are hard to plead and they're hard to win. They don't get through very often, less often than securities cases do. It's much more common for the securities case to get through than for the ERISA case to get through, and that's even before Dudenhofer that was the case. I don't want to sort of pour cold water on this issue, but it sounds to me, listening, as if it's exactly the kind of issue about the relationship between the securities laws' objectives and the allegation that the ERISA trustee should or needn't disclose in a different, you know. That's the issue. That's the second. So if I thought that that's the second question, the second part, not the third, and if I thought we just granted the third, what should I do in terms of the disposition of this case? In other words, I think the issue you raise, both raise and discuss, is very interesting and important, but I don't know that it's here. So if I think that, what's the right disposition? Disclosure here would not have been inconsistent with the securities laws. Just because it's not required by them, even the government concedes, it's not prohibited by them. Well, that's your first position is it isn't. Okay. Suppose I'm uncertain and don't think the issue was presented sufficiently below or argued sufficiently here. What do I do? I'm asking you for your – I'm not asking you it's not hostile or friendly. I just want to know what you think I should do. But it's a tricky proposition, because you have to send – I think you would have to send it back to the Second Circuit, but you'll have to tell them what kind of pleading needs to be done to answer this question. What statute are we pleading under? What interests matter? Because if you are just analyzing this as an ERISA claim, but you're saying you can only make disclosures that are required by the securities laws, it becomes a very difficult question as to whether the disclosure here is required by them or not. On the one hand, there wasn't an actionable 10b-5 claim. On the question we granted cert on, which is the third Dudenhofer factor, there is a circuit split, and we granted cert to resolve that circuit split. Basically, is earlier disclosure required in a situation when there are different classes of beneficiaries, or is that a situation where a prudent fiduciary should not be held liable? Isn't that the question presented? And it's a yes or no answer to that question. That is, yes. Yes. Right. And in that question presented, I think the Second Circuit did exactly what you would want courts to be doing in analyzing these issues. You know, just because you can plead that a fiduciary knows something that hasn't been disclosed and you can try to say that it's inevitable doesn't mean that all the facts around it are going to back that up. And it doesn't mean that the district court is going to look at that and be persuaded just because you said it's inevitable and earlier is better than later. You have to have the meat on the bones or it doesn't work. Sotomayor So wouldn't looking at Mr. Clement and looking just at the third prong, you suggested that whether you're a buyer or seller can't be judged, that you really should be looking at the whole class. But none of that is pled. You pled you were a buyer and the district court said that the period showed more buying than selling, and the district court said, no, it shows more selling than buying. So wouldn't a more particularized pleading basically put forth that theory, need to put forth that theory, and need to air it so that a district court judge could determine whether the pleadings are accurate? I think we did put forth that theory, actually. I think in our complaint we pleaded that holders were also damaged here by the harsher correction and slower stock price recovery that resulted. Sotomayor But you said that, but we still don't know whether the buyer and holder class was greater than the seller class. Where do I see that? Breyer I will say, I mean, it is a reasonable inference for virtually any stock plan, but particularly one of a company of this size, to say that the holders vastly outnumber the buyers. Breyer So is it fair to say when you talk about meat on the bones, I find one little piece of specific meat, and that is the word inevitable, and if I want to be fair to you, which I do, I'd say inevitable within a reasonably short time. And so we have one, or four, three things. One, in the longer run, the company benefits from disclosing now. All right? Number two, this is particularly true here where it's inevitable or nearly inevitable. Three, in the short time. And four, there is nothing special about this fund implied. That's it? Clement Yes. Breyer Okay. Roberts Thank you, counsel. Four minutes, Mr. Clement. Clement Thank you, Mr. Chief Justice. Just a few points in rebuttal. I mean, first of all, I do want to be clear. This is not a case where the Petitioner is running away from the question presented we got cert granted on. There is a circuit split. We think we win on the question presented. The allegations here are generic allegations. They could be made in every stock drop case. And then if you look at specifics, it really falls apart because one specific was net buyer, which turns out just isn't true, and they're not telling you that it's not true. I mean, they've walked away from that. And then the other one is this idea, well, there's this sale that makes it particularly likely. Well, listen to what my friend said. He said IBM was looking for a year to try to sell this microelectronics unit. The sale itself was hardly inevitable, and the allegations of the complaint say that. They say it was more likely than not. They don't say it was inevitable. Breyer And implicitly, nothing special. So you break your points when you send in the answer, when you move for summary judgment, and if necessary, have a trial. But the question is if they ask the four things, they put in the four things we just mentioned, and why isn't that sufficient? And then the rest is up to the defendant to deny whatever it is or say there is something special or say, why not? Clement I don't think it's sufficient, Your Honor, because you're going to be able to make those four allegations in every stock drop case. And the whole point, I thought, of the Dudenhofter factor was to separate meritless goats from plausible sheep. And if everything's a sheep, then I don't think Dudenhofer does what it says it's going to do. So I think we win on the question presented. But the reason that we briefed the broader issues of Pegram is that the longer you hear even the plaintiffs talk about this, the more you find there's a fundamental problem here. As he said, you know, the principal people he thinks the fiduciary should be looking out for are holders. Well, there's another word for holders. They're shareholders in the company. And the entire purpose of the disclosure regime under the securities law is to make sure that managers of companies are looking out for the long-term interests of shareholders and trying to maximize the value of the company. And they're supposed to disclose at certain intervals and not disclose at other intervals. They don't have to disclose when they have positive inside information. There's a whole body of law that addresses those interests. And that's the body of law that should be looked to here. One thing I want to be emphatic that I disagree with my friend on the other side is he says that the reason that we want these insiders to serve as fiduciaries is so they can be sort of canaries in the coal mine, they can take early action based on their unique access to inside information. That is absolutely wrong. The whole – all these funds are set up to make sure that doesn't happen, because if that did happen, these would all be latent security violations. So the reason, Justice Gorsuch, that it actually isn't implausible that a manager or a fiduciary of this doesn't know whether they're going to be net buyers and sellers is because they don't really do any of the buying and selling. That's just – if you've got more people who are new employees who say, yes, I want to be in the ESOP plan, then you get net buyers. If you have retirees who are selling, you have net sellers, and you don't know in advance. And I thought, based on what I read in Dudenhofer, that that ought to inure to the benefit of the fiduciary. I thought you were only liable if you could not have thought it was prudent to say, I'm not going to mess with this early disclosure. The last thing I want to end with is just there is – I don't want there to be a mistake. We do not agree with the United States on the bottom line here. We do not think that you should engage in a brave new world of hybrid ERISA-slash- securities actions where, I agree with my friend, lower courts would have to struggle with whether scienter applies. We say the solution is the securities law, full stop. Roberts. Thank you, counsel. The case is submitted.